W. H. ASKEY V. MRS. ALICE POWER ET AL.

No. 6524. Decided May 13, 1936.
(94 S. W., 2d Series, 136.)

336

*John L. Poulter,* of Fort Worth, for plaintiff in error.

The term "fraud" need not be used in the pleadings if the facts are averred which show fraud as a conclusion of law, and plaintiff had the legal right to invoke the equity powers of the district court to establish his claim against the defunct estate and subject the 100 acres of land, set apart to the widow and minor children of the deceased, to the part of his debt. Saunders v. Guinn, 1 S. W. (2d) 363; Dittman v. Weiss, 87 Texas, 614, 30 S. W., 863; Willis & Bro. v. Smith, 65 Texas, 656; 27 C J. 30, sec. 146.

*M. W. Burch* and *C. T. Gettys,* both of Decatur, for defendants in error.

MR. JUDGE TAYLOR delivered the opinion of the Commission of Appeals, Section B.

Plaintiff in error, W. H. Askey, sued Mrs. Alice Power and the seven children of herself and husband, D. L. Power, deceased, and T. J. Power, administrator of the estate of the deceased, to establish a debt and lien. The trial court after

hearing the evidence discharged the jury and rendered judgment in favor of plaintiff establishing the debt, but in favor of defendants with respect to fixing the alleged lien. The Court of Civil Appeals affirmed the judgment. 58 S. W. (2d) 1041. The case is before us on writ of error granted upon plaintiff's application.

, Plaintiff sued originally upon a judgment procured against D. L. Power in his lifetime to establish his claim against Power's estate and to enforce an alleged judgment lien against the lands belonging to the estate, praying that his debt be established and that the judgment be certified to the probate court for observance. Judgment was for defendants upon that trial, which was once before considered by the Court of Civil Appeals, 21 S. W. (2d) 326, and by the Supreme Court, 36 S. W. (2d) 446. It is not necessary to make a statement with respect to the former trial further than to say plaintiff's claim of lien alleged to have been fixed by virtue of the filing by him of an abstract of his judgment against Power, was settled adversely to his contention, and that the case not having been fully developed, was remanded for another trial.

After the case was remanded plaintiff filed his fifth amended petition in which he pleaded this immediate cause of action in which he seeks as before to establish his debt against the estate, and particularly to impress a lien upon 100 acres of land sold by the administrator and Mrs. Power along with the other lands belonging to the estate to Clyde Slay, and later by Slay conveyed to Mrs. Power. The conveyances made by the administrator and Mrs. Power, and by Slay, respectively, were consummated while the case was formerly pending on appeal, and are set out and complained of by plaintiff in the amendment upon which he proceeded to trial. As these and incidental transactions together with plaintiff's actions with respect thereto constitute the pivotal facts upon which the case turns they will be later referred to more in detail.

D. L. Power at the time of his death owned about 1300 acres of land, the whole of which was encumbered by a lien in favor of the Federal Land Bank for $9000, and a part of which, the Barney Lowe Survey containing 268 acres, was encumbered by an additional and second lien for about $3100 in favor of the National Livestock Commission Company of Fort Worth. In December, 1926, the probate court set aside to the widow and minor children 200 acres as the homestead out of the survey referred to. Subsequently on November 29, 1927, the order

setting apart the homestead out of the Barney Lowe Survey was set aside and vacated by the court on its own motion, and in lieu thereof 200 acres out of the Navarro County School Land Survey was set apart as the homestead. About the same time and as a related transaction Mrs. Power entered into a written contract with W. H. Slay and Clyde Slay of Fort Worth to sell them all the lands belonging to the estate except the 200 acres last designated as the homestead.

The contract recites among other things that whereas the homestead last designated was probably not of as great value as "some other 200-acre tract" out of the land belonging to the estate, and that Mrs. Power had not accepted same as her homestead, and would not, unless and until compensated for the difference in value between that tract and a different 200 acres that would otherwise be claimed by her, by the conveyance to her by the Slays of the 100-acre tract in question under the terms and conditions thereinafter to be set out:

"Now, therefore it is agreed * * * as follows: Parties of the first part (the Slays) agree * * * that in case they are able to purchase said remainder of said land, after taking off said homestead as above described, in consideration for the said homestead being * * * set aside as above described * * * as soon as they receive the title to said lands under said contemplated purchase, in case they are able to purchase the same, they will execute and deliver to party of second part (Mrs. Power) * * * deed conveying to her the 100-acre tract of land out of the land purchased by them * * *."

The Slays further obligated themselves by the terms of the contract to hold Mrs. Power harmless from the payment of any liens existing against the 100-acre tract for a period of two years from the date of the contract, and that they would within two years remove all liens and encumbrances from the 100 acres, and the 200-acre homestead last designated so that title thereto should be vested in her free of all liens and encumbrances.

The contract bound Mrs. Power, her heirs, administrator, etc., that if the 100 acres was conveyed to her under the terms stated she would accept as her homestead the 200 acres last set apart for that purpose, and stipulated in the closing paragraph that should the Slays not succeed prior to February 1, 1928, in purchasing and receiving deed to the lands under the administrator's sale, then the contract would not be binding, and Mrs. Power's right to select her homestead according to her own choice should remain unimpaired. The contract re-

cites it is witnessed the _____ day of November, 1927, and is signed by the two Slays and Mrs. Power.

The record discloses that the probate court on November 29, 1927, on reconsidering its first order of homestead designation to the widow and minor children vacated same and made another in lieu thereof on its own motion for the reason, as stated in the order, that the land first set aside was encumbered by the Land Bank and Commission Company liens, and that it "renders said property thus set aside in the original order as their homestead practically valueless to them." The record further discloses that thereafter the administrator made application for an order to sell all the lands belonging to the estate except the 200 acres last set aside as the homestead, and that he, joined by Mrs. Power, sold same on January 8, 1928, to Clyde Slay. The statement of facts contains an agreement that the notices on the application were duly issued and served and that the sale was regularly made in obedience to the order of the court. It contains also a copy of "a contest and opposition to the sale of the lands" filed and signed by plaintiff Askey's attorney, reciting that "W. H. Askey presents this his opposition and protest to the pretended sale and report thereof filed herein by T. J. Power, administrator of the estate of D. L. Power, deceased * * *." The contest recites among other grounds of opposition that it "was not made in good faith, * * * but in attempting to make the sale as reported herein, your contestant is informed and * * * believes * * * and so alleges that said administrator * * * and the widow of said D. L. Power * * * have heretofore entered into a private agreement * * * with the pretended purchasers of said lands * * * that in the event the sale as reported herein is confirmed * * * and * * * finally completed, the purchaser * * * in addition to the consideration mentioned * * * by the report filed, would after such pretended sale was completed, as an additional private consideration for the conveyance, * * * reconvey unto said Alice Power * * *, a full 100 acres of said lands free and clear of any liens or encumbrances whatsoever * * *." It further recites that the sale shown by the report was illegal and void and prays that it be annulled and set aside.

The probate court thereafter approved the administrator's report of sale over Askey's protest and directed in its order of confirmation that proper conveyance of the land be made to Clyde Slay upon his compliance with the terms thereof, and that the conveyance be made subject to the balance due the Land Bank, but "free and clear of the rights, title, estate and

liens held or claimed by any and every person whomsoever." The order also recites that "On this the 18th day of January, 1928, came on to be heard in the administration of the estate of D. L. Power, deceased, the report of sale of T. J. Power, administrator, * * * and the court having heard evidence in favor of and against the report, and having considered the protest filed herein by W. H. Askey is satisfied that the sale was fairly made, and in conformity with law, and for a fair price, etc."

The closing recital of the order reads:

"* * * and the rights, title, estate and lien of and every person, whomsoever, owning or claiming any such right, title, interest or lien in and to the lands and premises described in such report, are hereby divested out of them and each of them and vested in the fund so paid to said administrator for such property by such purchaser according to the rights and priorities as heretofore or hereinafter decreed by this court as the case may be and such conveyance shall vest in said purchaser full and absolute title to the real estate described in said report, and the claim, rights, interest, title and estate of every person whomsoever therein or thereto."

The following day, January 19, 1928, the administrator and Mrs. Power conveyed the land to Clyde Slay, he assuming the obligation to pay and discharge the liens then existing against all of the land belonging to the estate, and on the same day Slay pursuant to the terms of the contract conveyed the 100 acres of land in question to Mrs. Power, reciting a consideration of $1.00 and other consideration. Mrs. Power at the time of the trial owned the 100 acres of land in addition to her 200-acre homestead tract free of all liens, the encumbrance thereon having been discharged by Clyde Slay in accordance with the agreement.

In as much as plaintiff urges that the transactions discussed were fraudulent, it is not amiss to here quote a part of the testimony of Mrs. Power's attorney with respect thereto, which is not controverted:

"There was nothing at any time, anything withheld from Mr. Askey, anything about it. In fact I explained it to him on several occasions he could buy this land, if it was worth it. I explained to him if he could take care of that loan to the National Live Stock Commission Company that he could have the land; that the court, I believed, would deed it to him, if he would put in the additional consideration with reference to this, if he wanted to take the land, if he would take care of

that National Live Stock Commission Company loan, in addition to the Federal Land Bank loan, which Mr. Slay was doing. I told him he could get the land in preference to Mr. Slay. * * *

"We had tried to make a sale of this land every way in the world we could to somebody that would take it and pay off the encumbrances against it, and leave Mrs. Power a homestead. She had selected the one first set apart to her. For a time we had the idea the indebtedness and Deed of Trust to the National Livestock Commission Company had been satisfied and had been paid and had the idea that the $9000 loan owing to the Federal Land Bank and the interest on it and taxes against the land was all that was against it. Mr. Askey offered to take the land while we were under that impression. He had filed suit and all that, and offered to take the land, excepting that first homestead set aside and settle his suit all together, and we agreed that he might have it, subject to the approval of the probate court which had to be, and for a time there we thought we had everything settled, but it soon developed, the fact came to us that the deed of trust and notes made to the National Livestock Commission Company of some $5000, whatever that is shown to be, was still against it. About the time that developed, why, Mr. Slay got active trying to buy this land. W. H. Slay was doing all the negotiations, and he made an offer for the land, but he wouldn't agree to take the land if the homestead was out of where it had been designated. * * * So he went about trying to buy it this other way—that a different tract would be set apart to her. And after that they would buy it and get the title to it and deed 100 acres of it to her on the consideration of her designating the last tract as homestead, instead of having her deeding him the tract first set aside to her. His first idea was to have us make application for her setting aside the other tract. As representing her I didn't advise it. So, it wasn't done that way, as suggested before. At any rate, the court made the designation of the other tract. It was placed up to the court as to whether or not that was a feasible way of doing it."

The administration has not been formally closed. The administrator testified that after he sold the land to Slay nothing remained in the estate; that while there were many debts against the estate that had been allowed that could not be paid, and while the $1000 allowed in course of administration for the support of the surviving wife and minor children had never been paid on account of the estate's having no funds

with which to pay, he had kept the administration open on account of the Askey suit.

No appeal was taken from the order confirming the sale to Slay, which Askey agrees was regularly made; nor did he file suit asking cancellation of the sale, or make Slay a party to the suit. He does not here, nor has he heretofore sought to set aside the administrator's sale or the order setting aside the homestead, or the conveyance by Slay of the 100 acres to Mrs. Power; but recognizes the administration sale as having been regularly made, and ignores, so far as seeking relief against it is concerned, the conveyance of the 100 acres by Slay to Mrs. Power. He merely seeks to have land conveyed to Mrs. Power, and in her possession under such conveyance, sold to satisfy his claim as one of the creditors of the estate of D. L. Power, deceased.

■ No effort appears to have been made by plaintiff to procure any character of relief in the county court other than to file the protest referred to. The order of the court there made, as well as the order redesignating the homestead, became final. Vance v. Upson, 64 Texas, 266; Ruenbuhl v. Heffron, 38 S. W., 1028.

■ Had the conveyance of the 100 acres been made as part of a fraudulent transaction it would have been necessary for plaintiff to set it aside as a prerequisite to having the 100 acres again sold; and while the district court has general jurisdiction to set aside a sale fraudulently made by an administrator, it must do so in a suit filed directly for that purpose and not by way of collateral attack upon the sale. Gillenwaters et ux. v. Scott, 62 Texas, 670. The present suit is in the nature of a collateral attack upon orders of the county court that have become final. Crawford v. McDonald, 88 Texas, 626, 33 S. W., 325; Redmond v. Crowley, 123 Texas, 315, 70 S. W. (2d) 1113.

The judgments of the trial court and Court of Civil Appeals are affirmed.

Opinion adopted by the Supreme Court May 13, 1936.